## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAY KRUISE,** | : | **Civ. No. 3:23-CV-580** |
| | : | |
| **Plaintiff,** | : | **(Judge Saporito)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| | : | |
| **U.S. DEP'T OF ARMY, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

We do not write upon a blank slate in this employment discrimination case. Quite the contrary, the plaintiff's multi-faceted complaint has already been the subject of extensive summary judgment litigation, litigation which culminated with a comprehensive analysis by the Court. (Docs. 97, 98).

As a result of this thorough legal analysis, only two claims now remain for our consideration. Specifically, the Court authorized supplemental cross motions for summary judgment addressing two issues; namely, (1) whether the Army discriminated against the plaintiff in 2017 when he was denied an opportunity to compete for a GS-11 position at the Tobyhanna Army Depot; and (2) whether the Army retaliated against Kruise for his past EEOC activities in 2017 by providing him with fewer overtime opportunities than other workers received. The Court

permitted the filing of supplemental summary judgment motions relating to these two specific claims after finding that the record as to these allegations was not fully developed by the parties in their initial motions.

With the remaining issues in this case framed in this fashion, the parties have submitted competing supplemental cross motions for summary judgment. (Docs. 101, 109). These motions are fully briefed and are, therefore, ripe for resolution. For the reasons set forth below it is recommended that the defendant's summary judgment motion be granted with respect to the plaintiff's claim that the Army discriminated against the plaintiff when he was denied an opportunity to compete for a GS-11 position at the Tobyhanna Army Depot. It is further recommended that disputed, material issues of fact preclude summary judgment for either party on Kruise's allegation that the Army retaliated against him for his past EEOC activities by providing him fewer overtime opportunities than other workers received.

## II.  **Factual Background and Procedural History**

### A. **Introduction**

Over the past five years of litigation, the claims advanced by the plaintiff in this case have become narrowed and focused. Currently, the remaining claims before us relate to conduct at the Tobyhanna Army Depot and Kruise's allegations that: (1) the Army discriminated against the plaintiff when he was denied an opportunity to

2

compete for a GS-11 position at the Tobyhanna Army Depot; and (2) the Army retaliated against Kruise for his past EEOC activities by providing him with fewer overtime opportunities than other workers received.

While the gist of these two allegations relate to conduct which took place at Tobyhanna in 2017, the roots of these disputes stretch back a decade earlier and entail aspects of Kruise's occasionally contentious working relationship with Army officials. With respect to these allegations, the pertinent facts[1] reveal that the plaintiff, Jay Kruise, is an individual of Asian descent. Aside from this common element, Kruise's two remaining allegations rest upon somewhat divergent factual threads, as discussed below.

### B. Background of Kruise's Promotion Discrimination Claim

Kruise's 2017 promotion discrimination claim has its roots in events which took place more than a decade earlier, between 2003 and 2007. In 2003, Kruise was employed as a GS-9 worker at Tobyhanna Army Depot when he accepted an overseas assignment. While overseas it is alleged that his status was adjusted to the equivalent of a GS-11 position. In the meanwhile, the Army kept a GS-9 position open for Kruise upon his return.

---

[1] This statement of facts is derived from the parties' submissions to the extent that those submissions are supported by otherwise uncontested evidence.

After some thirty-six months, Kruise's overseas tour of duty was not extended. At that time, Kruise received an email from Suzanne Tribble, an Army employee,  which offered him two options. First, he could opt for pay retention; that is, he would return to work at Tobyhanna as a GS-9 employee, but his pay would be set in accordance with the GS-9 pay scale at a rate equivalent to the GS-11 pay he had been receiving. (Docs. 102-3, 115-2). If Kruise accepted this option, he was advised in 2007 that, "[y]ou will also be eligible for noncompetitive re-promotion to the GS-11 level," although this eligibility process was not further explained in the email. (Id.)

In the alternative, Kruise was informed that he could register in what was called the Priority Placement Program (PPP) for placement in a GS-11 position upon his return. (Id.) PPP is a program that provides career placement assistance to individuals who are eligible for priority consideration to higher graded position which they left through no fault of their own. This program provided greater career advancement options but does not appear to have offered the same degree of pay retention protection. In 2007, Kruise opted for the pay retention option.[2]

---

[2] Kruise complains that this 2007 election was forced upon him because the Army failed to abide by a promise to extend his overseas tour of duty, but nothing about this nearly twenty-year old breach of contract claim adds to our understanding of the plaintiff's current Title VII claims. In any event, Kruise never timely advanced this claim that he made his 2007 election under duress.

4

It appears, at a minimum, that this 2007 election by Kruise led to mutual misunderstandings which compounded over time. For his part, Kruise insists that the 2007 email's vague reference that "[y]ou will also be eligible for noncompetitive re-promotion to the GS-11 level," automatically provided him with some form of preferential reinstatement rights which were violated a decade later when a woman named Paulette Vadosky was selected to fill a vacancy at Tobyhanna Army Depot. However, the nature and scope of the repromotion rights claimed by Kruise are entirely unclear.

In contrast, citing various Defense Department policies and regulations, the Army explains that the PPP program and other repromotion list programs existed at Tobyhanna, but Kruise's circumstances in 2007 did not meet the technical requirements of any of these programs. (Docs. 115-3, 4, 5, 7). Moreover, Kruise's pay retention election entailed a decision to forego placement in the PPP program. Therefore, Kruise would have to take additional affirmative steps in in order to be considered for non-competitive GS-11 promotions. In contrast, Ms. Vadosky, who previously held a permanent GS-11 position within the same department from 2005 through 2011, was eligible and qualified for the non-competitive promotion. It was the understanding of Herbert Shirey, the depot's Director of Installation Services, that Vadosky qualified for this non-competitive promotion, and the depot's Human

5

Relations office confirmed that Vadosky qualified for the promotion. (Doc. 115-7). According to Shirey, given this understanding, Vadosky was the only candidate considered for the non-competitive promotion. Notably Shirey has stated that he was completely unaware of whether Kruise could have qualified for a non-competitive appointment to this position at the time of this decision. (Id.) This decisionmaker's unrebutted statement that he was completely unaware of Kruise's potential eligibility for the position cuts against any suggestion that the promotion of Vadosky was part of an intentional effort to discriminate against Kruise.

### C. **Kruise's Overtime Retaliation Claim.**

Kruise's 2017 overtime retaliation claim also has its roots in his contentious past working relationship, particularly his working relationship with one supervisor, Caroline Jurosky. This strained working relationship stretched back several years and involved EEO proceedings brought by Kruise, some of which were still pending in 2017 at the time of the controversy regarding overtime assignments. Thus, on November 18, 2014, Jurosky proposed a 10-day suspension against Kruise for alleged insubordination. (Doc. 102 ¶ 16). On March 23, 2015, Kruise received a 5-day suspension without pay, an action which led Kruise to file a formal EEO reprisal complaint against Jurosky on April 28, 2015. (Id., ¶¶ 17-18).

While this EEO complaint was pending, Kruise and Jurosky became entangled in a separate workplace dispute. This dispute began in August 2015 when Kruise requested a reasonable accommodation which was denied. Later, in December of 2015, Kruise and Jurosky became embroiled in a disagreement regarding alleged alterations of his performance appraisal and Jurosky issued a counseling statement to Kruise. (Id., ¶¶ 19-21). Consequently, on January 22, 2016, Kruise filed a second EEO complaint addressing these issues. (Id., ¶ 22).

These EEO proceedings were still pending in January of 2017,[3] when employees in the IT department where Kruise was assigned were notified that they would be undertaking a computer project at Tobyhanna which would entail some mandated overtime. (Id., ¶ 23). Kruise's direct supervisor, Caroline Jurosky, who was also the subject of his pending EEO complaints, was responsible for assigning staff overtime on this project. According to Jurosky's superior, Christopher Brooks, Jurosky initially opposed providing any overtime to Kruise citing, in part, his prior complaints. As Brooks avers:

> In February, Ms. Jurosky talked to me about overtime for [Kruise]. Based on his prior complaints and not being interested in Customer Service, she wasn't going to offer it to him. I told her to offer it to him and everyone else anyway. Provide the same possibilities for everyone.

---

[3] On June 8, 2017, Kruise's 2015 and 2016 EEO complaints were resolved. (Id., ¶ 32).

(Doc. 115-11, ¶ 23).

Jurosky also apparently conveyed her initial intention to categorically deny overtime to Kruise, who contacted Brooks by email on February 3, 2017, reporting that Jurosky had informed him that he was "excluded from OT." (Doc. 102-28). Brooks responded by notifying Kruise that all employees were included in the overtime opportunity, and that there were no opt-outs. (Id.)  As Brooks explained, this was mandated overtime: "Everyone is being voluntold [sic] and will be part of the OT cycle." (Id.)

With Brooks having overruled Jurosky's request to exclude Kruise from this overtime project, the project moved forward through the Spring and Summer of 2017. During this six month period Kruise was assigned approximately 54 hours of overtime. While this overtime exceeded that of some other employees, it was significantly less than the overtime awarded to two workers, who each received more than 70 hours of overtime. (Docs. 115-25, 26).

The reasons for this disparity are disputed. From his perspective, citing Jurosky's initial stated intention to exclude him entirely from receiving overtime based, in part, on his prior complaints, Kruise asserts that this disparity represented an effort by Jurosky to retaliate against him based upon his pending EEO complaints. For her part, Jurosky denies that she retaliated against Kruise and insists that the

8

difference between the overtime awarded to these workers was a function of their skill levels and roles in this project. According to Jurosky, the individuals who received more overtime were "lead" workers on this project who had greater training. Kruise, in turn, was relegated to a "helper" role due to his lack of training in certain areas. Kruise contends that this justification is pretextual since his skills, while not identical to the "lead" employees, were comparable.

It is against this factual backdrop that we consider the parties' cross motions for summary judgment.

## III.    <u>Discussion</u>

### A. <u>Cross Motions for Summary Judgment – Standard of Review</u>

The parties have filed cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." <u>Univac Dental Co. v. Dentsply Int'l, Inc.</u>, No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The

9

substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla

of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark New Jersey v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982); see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969).

11

Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Given these guiding legal standards, it is emphatically not the province of the court to weigh evidence or assess credibility when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. Id. Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Anderson, 477 U.S. at 252; see also Big Apple BMW, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even

if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Finally, in this case, we are presented with cross motions for summary judgment. In this setting:

> "When confronted with cross-motions for summary judgment ... 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.' " Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F.Supp.2d 425, 430 (M.D. Pa. 2006) (quoting Marciniak v. Prudential Fin. Ins. Co. of Am., 184 Fed.Appx. 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." Id. (citing Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998)).

Pellicano v. Office of Pers. Mgmt., Ins. Operations, 8 F. Supp. 3d 618, 625–26 (M.D. Pa. 2014), aff'd sub nom. Pellicano v. Office of Pers. Mgmt., 714 F. App'x 162 (3d Cir. 2017).

It is against these benchmarks that we assess the parties' cross motions for summary judgment.

13

B. **Elements of Title VII Claims**

As we construe the plaintiff's remaining claims, Kruise is asserting a workplace Title VII discrimination claim based upon his race as well as a Title VII retaliation claim. These claims are judged by well-established legal standards.

1. **Discrimination Claims**

Turning first to Kruise's Title VII discrimination claim, Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against and/or discharging their employees because of their race or national origin. 42 U.S.C. § 2000e-2(a)(1). Title VII discrimination claims are governed by the McDonnell-Douglas burden-shifting framework. In brief, that framework requires that the plaintiff demonstrate that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) under circumstances that give rise to an inference of unlawful discrimination. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). The last element also requires that the plaintiff demonstrate a causal connection between his protected status and the allegedly adverse action. Id. at 798. The key focus of the *prima facie* test is "always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" Id. (citation omitted). The elements of the *prima facie* case "must not be applied woodenly but must rather be tailored flexibly to fit the circumstances

14

of each type of illegal discrimination." Geraci v. Moody-Tottrup Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996).

Further, under the McDonnell Douglas burden-shifting framework if the employee establishes a *prima facie* case of discrimination or retaliation based upon some immutable and protected characteristic, the burden shifts to the employer to advance a legitimate, non-discriminatory reason for its conduct, and if the employer does so "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that [discrimination] was the real reason for the adverse employment action." Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997)).

On this score:

> To prove pretext by discrediting the employer's articulated reasons, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Fuentes, 32 F.3d at 765 (internal quotation marks omitted) (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir.1993)); see also Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 527, 531 (3d Cir.1992); Shaner, 204 F.3d at 501; Reifer, 462 F.Supp.2d at 635. The plaintiff must show "not merely that the employer's proffered reason[s] [were] wrong, but that [they were] so plainly wrong that [they] cannot have been the employer's real reason[s]." Keller, 130 F.3d at 1109. To make this showing, the plaintiff may introduce evidence to show "(1) that the proffered reasons had no basis in fact[;] (2) that the

15

proffered reasons did not actually motivate [the act;] or (3) that they were insufficient to motivate [the employer's actions]." Petrikonis v. Wilkes–Barre Hosp. Co., No. 11–280, 2013 WL 5877000, at \*7 (M.D.Pa. Oct. 30, 2013).

Proudfoot v. Arnold Logistics, LLC, 59 F. Supp. 3d 697, 705 (M.D. Pa. 2014), aff'd, 629 F. App'x 303 (3d Cir. 2015).

### 2. Title VII Retaliation Claims

Settled legal benchmarks also guide our evaluation of Title VII retaliation claims. In this regard:

> To make out a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) that he engaged in protected activity; (2) that he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 257 (3d Cir. 2017). Ultimately, a plaintiff bringing a Title VII retaliation claim must be able to show that his participation in protected activity was the but-for cause of any alleged adverse employment action that he suffered. Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"); see also Grevious, 851 F.3d at 257 (noting that a plaintiff alleging Title VII retaliation "has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination under Title VII"). "The ultimate question in any retaliation case is an intent to retaliate vel non." Jensen, 435 F.3d at 449 n.2.
>
> As we have noted, Title VII claims are subject to the McDonnell Douglas burden-shifting framework. Thus, if the employee establishes

16

a *prima facie* case of discrimination or retaliation based upon race, the burden shifts to the employer to advance a legitimate, non-discriminatory and non-retaliatory reason for its conduct, and if the employer does so "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that [discrimination or] retaliation was the real reason for the adverse employment action." Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997)). Further, "[t]he Supreme Court has recently clarified that, as to the third prong, a plaintiff making a claim of retaliation under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Verma v. Univ. of Pennsylvania, 533 F. App'x 115, 119 (3d Cir. 2013) (citing Nassar, 133 S.Ct. at 2534).

Cooper v. Pennsylvania Hum. Rels. Comm'n, 578 F. Supp. 3d 649, 666-67 (M.D. Pa. 2022).

A crucial element of any workplace discrimination or retaliation claim is causation; that is, the plaintiff must show that the allegedly discriminatory or retaliatory action was causally related to some protected status or activity. Thus, in the context of a Title VII retaliation claim:

A plaintiff must also show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have discouraged a reasonable employee from making or supporting a charge of discrimination. "Many may suffer ... harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006). This third element "identif[ies] what harassment, if any, a reasonable jury could link to retaliatory animus." Id. at 449-50. "The

17

ultimate question in any retaliation case is an intent to retaliate vel non."

Bonson v. Hanover Foods Corp., 451 F. Supp. 3d 345, 353 (M.D. Pa. 2020).

These questions of motive, intent and causation may not always be susceptible to direct proof. Therefore, courts have recognized a variety of means by which intent and causation may be shown. Of course,  direct evidence of a stated intent to retaliate satisfies these elements of proof. Where direct proof is unavailable two other forms of evidence may suffice. "To demonstrate a causal connection, a plaintiff generally must show either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism, coupled with timing, to establish a causal link." Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 258 (3d Cir. 2014) (quotation marks omitted).

> **C.** **The Defendant is Entitled to Summary Judgment on Kruise's Claim that  in 2017 He was Denied an Opportunity to Compete for a GS-11 Position at the Tobyhanna Army Depot But Disputed Issues of Fact Preclude Summary Judgment in Favor of Either Party on Kruise's 2017 Overtime Denial Retaliation Claim.**

> **1.  Kruise's 2017 Promotion Discrimination Claim Fails**

Turning to the remaining claims in this case and viewing those claims through the legal lens demanded by Title VII and Rule 56 of the Federal Rules of Civil Procedure, it is recommended at the outset that the Court grant the defendant's summary judgment motion with respect to Kruise's claim he was denied an

opportunity to compete for a GS-11 position at the Tobyhanna Army Depot. While the precise nature of this particular discrimination claim has been somewhat elusive,[4] as we construe it, Kruise invites us to find that he was the victim of racial discrimination in 2017 when another worker, Paulette Vadosky, was selected in a non-competitive basis for a position at Tobyhanna Army Depot. As cast by Kruise, this discrimination has roots that extend back a decade to 2007 when he returned from an overseas tour of duty and elected to receive pay retention rather than seeking a preferred placement status. Thus, Kruise's discrimination claim attempts to stitch together disparate acts by diverse actors spanning a decade into a single unitary fabric of discrimination.

This is a challenging task for Kruise since it is well settled that "[t]he central focus of the *prima facie* case is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" Sarullo, 352 F.3d at 798 (quoting Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999)). In this case we find that the undisputed evidence simply does not support the inference Kruise seeks to draw. Instead, at most, the

---

[4] At various times Kruise seems to have suggested that his 2007 pay retention election was somehow unlawful or that efforts in the mid-2010's to compete for jobs were discriminatory, but these nascent and factually undeveloped claims appear to be both unexhausted and lacking in merit.

19

evidence reveals a mutual misunderstanding in which Kruise believed that he automatically possessed greater rights to seek non-competitive promotion opportunities than the Army understood him to possess. In this regard, Kruise and the defendant have devoted great time and energy arguing their respective interpretations of the Army's occasionally labyrinthine employment policies, practices and regulations. However, we need not ultimately resolve these competing constructions of the Army's bureaucratic policies because the defendant's position constitutes a reasonable interpretation of their rules and, beyond his own speculation, Kruise has provided insufficient evidence to suggest that the Army's interpretation of employee eligibility for non-competitive job openings was pretextual and was designed to conceal invidious discrimination.

Instead, the evidence indicates that Kruise's inability to obtain preferential job placement was, in part, a product of his election to seek pay retention rather than participation in the PPP program in 2007. To the extent that Kruise may experience some remorse at this election, that remorse cannot reasonably be translated into evidence of discriminatory bias a decade later by the defendant. Further, without more, Kruise cannot convert a passing reference in 2007 email that he may be able to apply for positions in the future into proof of racial bias some ten years later in

2017, when another person with a recognized preferential status received a promotion.

On this score, the uncontested evidence indicates that the agency decisionmaker believed that Ms. Vadosky qualified for the promotion under the Army's existing rules and confirmed that fact with the Human Relations office before promoting her to this GS-11 position. Notably, nothing in the evidence suggests that the decisionmaker was aware of Kruise's interest or eligibility for the position on a preferential non-competitive basis. Therefore, the record is devoid of information which would: (1) support an inference of discrimination based upon these disparate events; (2) rebut the Army's assertion that it relied upon a reasonable and neutral application of its own rules and policies to limit its promotion consideration to Ms. Vadosky; or (3) show that the proffered justification for this decision was pretextual.

This claim fails.

### 2. Disputed Facts Preclude Summary Judgment in Favor of Either Party on Kruise's Overtime Denial Retaliation Claim

The same cannot be said, however, for Kruise's retaliation claim. Indeed, as to this claim, stark contrasts in the evidence relating to questions of motive and causation defeat both cross motions for summary judgment.

21

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: '(1) []he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against h[im]; and (3) there was a causal connection between h[is] participation in the protected activity and the adverse employment action.'" Selvato v. SEPTA, 658 F. App'x 52, 56 (3d Cir. 2016) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). In this case, it is undisputed that Kruise was engaging in EEO proceedings involving his supervisor Jurosky in 2017, when these overtime opportunities arose. Therefore, the first element of a Title VII retaliation claim is met here.

Instead, in its summary judgment motion the Army argues that it is entitled to judgment as a matter of law in its favor on the two remaining elements of a retaliation. At the outset, citing a single district court case, the Army insists that denying Kruise overtime was not a materially adverse employment action since "[b]eing denied overtime itself is not a materially adverse employment action when overtime is not an entitlement." Hanson-Hodge v. Kijakazi, No. CV 22-2818-BAH, 2023 WL 8357322, at *12 (D. Md. Dec. 1, 2023).

In our view the question of whether, and when, denying overtime constitutes an adverse action for purposes is more subtle and fact dependent than the defendant suggests. Robinson v. D.C., 275 F. Supp. 3d 95, 105 (D.D.C. 2017) ("determining

22

whether the loss of overtime constitutes an adverse employment action is a fact-specific inquiry"). To be sure, "a speculative increase in potential overtime does not qualify as a change in the terms or conditions of employment," under Title VII. Swain v. City of Vineland, 457 F. App'x 107, 111 (3d Cir. 2012). However, a rising tide of caselaw supports the proposition that the denial of scheduled overtime may constitute an adverse action for purposes of a Title VII retaliation claim since it qualifies as a change in the terms and conditions of a worker's employment.[5] In particular, lost overtime can be considered "an adverse employment action where the trier of fact could reasonably conclude that . . . it was otherwise known to defendant that plaintiff desired such opportunities." Bell v. Gonzales, 398 F. Supp. 2d 78, 97 (D.D.C. 2005).

---

[5] See e.g., Lewis v. City of Chicago, 496 F.3d 645, 654 (7th Cir. 2007) (denying summary judgment on overtime claim); Robinson v. D.C., 275 F. Supp. 3d 95, 105 (D.D.C. 2017) (same). See also Roache v. Long Island R.R., 487 F. Supp. 3d 154, 171–72 (E.D.N.Y. 2020) ("the denial of opportunity to work overtime or earn greater responsibility may be considered sufficiently adverse to support a discrimination claim" citing DeLuca v. Sirius XM Radio, Inc., No. 12-cv-8239 (CM), 2017 WL 3671038, at *14 (S.D.N.Y. Aug. 7, 2017) (change in workplace responsibilities or denial of opportunities that results in revocation or denial of overtime eligibility may have an adverse impact on employment); Johnson v. Long Island Univ., 58 F. Supp. 3d 211, 223–24 (E.D.N.Y. 2014) (the denial of an opportunity to earn additional compensation constitutes an adverse employment action); Agostinello v. Great Neck Union Free Sch. Dist., No. 05-cv-5838 (WDW), 2009 WL 238865, at *20 (E.D.N.Y. Feb. 2, 2009), aff'd, 353 F. App'x 589 (2d Cir. 2009) (a denial of opportunities to work overtime "might amount to an adverse employment action").

In the instant case, Kruise protested Jurosky's denial of any overtime opportunities to her superior, Christopher Brooks, and Brooks assured the plaintiff that he was entitled to overtime. Construing this evidence in a light most favorable to the plaintiff suggests that it was known that the plaintiff desired overtime opportunities. Knowing Kruise's interest in overtime, it appears that Jurosky, who initially stated that Kruise should receive no overtime due to his prior complaints, awarded him less overtime than some other workers. Given these undisputed facts, the Army may not obtain judgment in its favor as a matter of law based upon the notion that denying or curtailing Kruise's overtime was not an "adverse employment action."

Likewise, disputed issues of motive and intent preclude summary judgment in favor of either party on the third element of this retaliation claim; namely, whether there was a causal connection between Kruise's participation in the protected activity and the adverse employment action. On this score, any defense summary judgment motion encounters a stubborn fact: The undisputed evidence shows that Jurosky initially proposed totally denying Kruise any overtime in part "[b]ased on his prior complaints." (Doc. 115-11, ¶ 23). In Title VII retaliation cases it is axiomatic that causation and retaliatory motivation can be shown through direct proof or established circumstantially through (1) an unusually suggestive temporal

24

proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism, coupled with timing, to establish a causal link. Budhun, 765 F.3d at 258.

While the Army argues that Kruise's retaliation claim fails because there is no highly suggestive temporal proximity between his 2015 and 2016 EEO complaints and the denial of overtime in 2017, this argument fails because temporal proximity is not the sole means of proving motive and causation. Moreover, Jurosky's reported intention to completely forbid Kruise from obtaining overtime based upon his prior complaints at a time when his EEO complaints were still pending, at a minimum, creates a factual question concerning whether there is direct evidence of retaliation or whether Jurosky's statements reveal a pattern of antagonism, which, coupled with timing, establish a causal link.

Similar considerations bar any defense summary judgment based upon the assertion that Jurosky possessed a neutral non-retaliatory reason for assigning less overtime to Kruise than that awarded to two other workers. On this score, the evidence is equivocal and cuts both ways. While there is a disparity between the hours that Kruise received and the overtime awarded two coworkers, a fact which could permit an inference of retaliation, it is also apparent that Kruise was given more overtime than some other employees, a fact which tends to undermine this

25

inference. Further, Jurosky advances a neutral reason for this disparity asserting that the individuals who received more overtime were "lead" workers on this project who had greater training and stating that Kruise was relegated to a "helper" role due to his lack of training in certain areas. However, Kruise contends that this justification is pretextual since his skills, while not identical to the "lead" employees, were comparable.

Recognizing that an employer's proffered neutral justification for some action can be rebutted when a plaintiff presents evidence that that the proffered reasons did not actually motivate the act or that they were insufficient to motivate the employer's actions, Proudfoot, 59 F. Supp. 3d at 705, we find that, in this case where Jurosky allegedly stated that she wanted to completely deny Kruise overtime based upon his prior complaints, disputed issues of fact abound regarding whether the denial of some overtime was pretextual. These disputed issues include contested questions of motive, which by itself precludes summary judgment for either party since: "'The motive or absence of motive of a party to engage in conduct alleged by another party is relevant to determining whether a genuine issue of fact exists.'" Cooper, 578 F. Supp. 3d at 668 (quoting Berda v. CBS Inc., 800 F.Supp. 1272, 1276 (W. D. Pa), aff'd., 975 F.2d 1548 (3d Cir. 1992)). But the factual disputes in this case extend beyond matters of motive to questions regarding the comparability of the various

26

employees who received overtime during this period and the degree to which the equivocal evidence regarding these overtime awards demonstrates a retaliatory motive. None of these hotly contested factual issues is susceptible to resolution as a matter of law in favor of either moving party. Therefore, as to this retaliation claim, the parties' cross motions should be denied.

## IV. <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED THAT the parties' supplemental cross motions for summary judgment, (Docs. 101, 109), be GRANTED in part and DENIED in part as follows: IT IS RECOMMENDED that the defendant's summary judgment motion, (Doc. 109), be GRANTED with respect to the plaintiff's claim that the Army discriminated against the plaintiff when he was denied an opportunity to compete for a GS-11 position at the Tobyhanna Army Depot. IT IS FURTHER RECOMMENDED that disputed, material issues of fact preclude summary judgment for either party on Kruise's allegation that the Army retaliated against him for his past EEOC activities by providing him fewer overtime opportunities than other workers received.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the

27

disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses, or recommit the matter to the magistrate judge with instructions.

Submitted this 4th day of June 2026.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

28